**Stephen Todd BOOKER, Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, Secretary, Dept. of Corrections, State of Florida, Respondent-Appellee.**

No. 84–3306.

United States Court of Appeals, Eleventh Circuit.

June 21, 1985.

Rehearing and Rehearing En Banc Denied Aug. 9, 1985.

James E. Coleman, Wilmer, Cutler & Pickering, Jeffrey Robinson, Washington, D.C., Steven L. Seliger, Quincy, Fla., for petitioner-appellant.

Lawrence Kaden, Asst. Atty. Gen., Tallahassee, Fla., for respondent-appellee.

Before VANCE, HENDERSON and CLARK, Circuit Judges.

ALBERT J. HENDERSON, Circuit Judge:

Stephen Todd Booker appeals from dismissal by the United States District Court for the Northern District of Florida of his petition for a writ of habeas corpus. Finding no error in the district court's judgment, we affirm.

On June 21, 1978, Booker was found guilty of burglary, sexual assault and first degree murder in the Circuit Court of the Eighth Judicial Circuit, in and for Alachua County, Florida. Concluding that the murder was perpetrated in an "especially heinous, atrocious or cruel" manner, the jury recommended the death penalty. On October 20, 1978, the trial judge sentenced Booker to death. The Florida Supreme Court upheld the conviction and sentence on March 19, 1981. *Booker v. State*, 397 So.2d 910 (Fla.1981). The Supreme Court of the United States denied his petition for certiorari on October 19, 1981. *Booker v. Florida*, 454 U.S. 957, 102 S.Ct. 493, 70 L.Ed.2d 261 (1981). The governor of Florida subsequently conducted clemency review proceedings on February 17, 1982. On March 22, 1982 the governor signed a warrant of execution, and Booker's sentence was scheduled for execution on April 21, 1982. On April 13, 1982, the petitioner filed a motion for post-conviction relief in the Florida circuit court. The court denied the motion the next day, and the Florida Supreme Court affirmed the judgment of

the circuit court on April 19, 1982. *Booker v. State,* 413 So.2d 756 (Fla.1982).

Also on April 13, 1982 Booker filed his first petition for a writ of habeas corpus and an application for stay of execution in the United States District Court for the Northern District of Florida. The application and petition were denied on April 19 and 20, 1982, respectively. On April 20, 1982 this court granted a stay of execution in order to review fully the district court's decision. *Booker v. Wainwright,* 675 F.2d 1150 (11th Cir.1982). The district court opinion was affirmed by this court on April 25, 1983. *Booker v. Wainwright,* 703 F.2d 1251, *reh'g denied,* 708 F.2d 734 (11th Cir. 1983). On October 17, 1983, the United States Supreme Court denied certiorari. *Booker v. Wainwright,* —— U.S. ——, 104 S.Ct. 290, 78 L.Ed.2d 266 (1983).

On October 27, 1983, the governor signed a second death warrant, and execution was scheduled for November 17, 1983. On November 1, 1983 new counsel assumed responsibility for Booker's appeals. Prior to this time, Booker had been represented by public defender Stephen Bernstein. On November 8, 1983, the new attorney filed a motion for post-conviction relief in the state trial court pursuant to Fla.R.Crim. Pro. 3.850. The motion alleged that (1) Bernstein had failed to provide Booker with effective assistance of counsel at his trial, (2) the prosecutor had made inflammatory comments to the jury, (3) Florida's aggravating factor "especially heinous, atrocious or cruel" was unconstitutionally vague, (4) Florida applies the death penalty in a racially discriminatory manner, (5) the Florida Supreme Court denied Booker due process by refusing to furnish him a written account of its proportionality review of his sentence and (6) execution by electrocution constitutes cruel and unusual punishment. None of these claims were raised in Booker's first post-conviction motion in the Florida courts or in his first habeas petition in the federal district court. Following a November 14, 1983 hearing on the ineffectiveness of counsel issue, the state trial court denied relief. The Florida Supreme Court affirmed on November 17, 1983, *Booker v.*

*State,* 441 So.2d 148 (Fla.1983), and execution was set for November 18, 1983.

Booker filed a second habeas petition in the United States District Court for the Northern District of Florida on November 16, 1983. This petition asserted all the alleged constitutional errors made in the § 3.850 motion in the state court. Fourteen hours before the scheduled execution, the district court issued a stay and set a hearing for December 8, 1983. At that hearing the court considered arguments relating to (1) the application of the procedural default doctrine, (2) the presumption of correctness of the state court's factfinding on Booker's ineffectiveness of counsel allegation as set forth in 28 U.S.C. § 2254(d), (3) the standard of review for a successive petition and (4) discovery under § 2254. Booker withdrew his cruel and unusual punishment claim. The court set another hearing for December 14, 1983 on whether Booker's second petition constituted an abuse of the writ.

During this latter hearing Booker sought to excuse his failure to raise the ineffectiveness of counsel claim in his first federal habeas corpus petition, contending that his original attorney, Stephen Bernstein, labored under a conflict of interest. He alleged that Bernstein failed to make this challenge in order to avoid an attack on his own effectiveness at the trial. Booker stressed that Bernstein not only continued to represent him but also advised him that such a claim was, though possible, not a viable one. For this reason, Booker asserted that he did not intend to omit the charge of ineffectiveness in his first petition, but rather simply believed he could not raise it.

The only witness appearing at the December 14, 1983 hearing was Stephen Bernstein. Following his testimony on behalf of the state and cross-examination by Booker's counsel, Booker's attorney informed the court that he would not call any witnesses. When the court inquired whether Booker wanted to testify, counsel answered no. The court then asked Booker if he wished to testify. Because Booker's answers were confusing, counsel requested a

recess for the purpose of consulting his client. After consultations with Booker, his lawyer reaffirmed the decision that Booker would not testify. Bernstein's testimony is uncontradicted, and the district court properly accepted it as entirely accurate.

Bernstein testified that about one month prior to Booker's February 17, 1982 clemency hearing, Bernstein advised Booker that clemency was not likely to be granted in his case. Therefore, Bernstein asked Booker to consider claims that he should assert in a § 3.850 motion and in a federal habeas corpus petition. Bernstein identified for Booker both claims Bernstein believed were appropriate to this case and also challenges that other inmates had used to obtain stays of execution. Record, December 14, 1983 hearing, p. 28. He also told Booker that he should consider whether he had had effective assistance at trial. *Id.* p. 12. Bernstein explained that "this was one of the issues that a great number of inmates in that position had raised and that it had gotten stays in some situations." *Id.* p. 13. Bernstein cautioned Booker that such a charge would require another lawyer since Bernstein could not attack his own effectiveness. *Id.* pp. 12, 29. Bernstein promised to help Booker procure another attorney to pursue the charge of ineffectiveness of counsel. *Id.* p. 29. The lawyer added that the time to raise the issue, if Booker wanted to do so, was in the first motion and petition. *Id.* p. 35. Booker understood what Bernstein told him. *Id.* p. 13. Booker immediately responded, "No, I will stick with you," but Bernstein replied, "No, I don't want you to make a decision. I want you to think about this particular issue." *Id.* Bernstein did not suggest any specific grounds in support of such a claim in Booker's case. *Id.* pp. 28–29, 31.

During the week after the first warrant for execution was signed, Bernstein and Booker reviewed all the possible claims they had discussed in January, including ineffective assistance of counsel. Bernstein later testified:

> I told [Booker] I didn't think it was an issue for us to raise. I told him that if

he wanted to raise that issue that we would have to get another attorney. I told him that if he had a question about it we would get another attorney.

. . . .

> I told him that if we raised the issue of ineffective assistance of counsel I couldn't do that, we had to get another lawyer. I would help him get another lawyer.

> I told him if he had any questions about the issue, even if he just didn't know or wanted something inquired into, that we had to get him another lawyer to help him resolve those questions.

> At that point he said, 'No, I want you to represent me,' and expressed no desire to raise the issue....

*Id.* pp. 19, 15. Booker made the choice not to challenge Bernstein's competence. *Id.* p. 25. He understood that he had the option to assert ineffectiveness of counsel but decided against it. *Id.* pp. 25, 31–32. Bernstein reminded him that it should be included in the first petition. Booker never even suggested, however, that he wanted to pursue this line of attack, nor did he ask any questions about it. *Id.* pp. 20, 32. Bernstein believed he had supplied effective trial representation. If he had thought Booker had grounds for an allegation of ineffectiveness, he would have taken steps to include it in the § 3.850 motion and the habeas corpus petition. *Id.* p. 32. Booker never expressed dissatisfaction with Bernstein's representation. *Id.* pp. 8, 32. Two weeks later, on April 13, 1982, Bernstein filed the § 3.850 motion and habeas corpus petition. *Id.* p. 30. He made no ineffective assistance of counsel charge.

Following the December 14, 1983 hearing, the district court denied Booker's second petition. The court found that the belated allegation of ineffective trial counsel constituted an abuse of the writ, that Booker had no right to a written account of the Florida Supreme Court's proportionality review and that Booker's remaining constitutional grounds for relief had been procedurally defaulted. This appeal followed.

*Abuse of the Writ.*

██ A petitioner who fails to include all his grounds for relief in his first habeas petition risks dismissal of claims raised for the first time in later petitions. In response to a successive petition containing new grounds for relief, the state may specifically plead abuse of the writ. The state carries its burden by recounting the petitioner's writ history, identifying the claims not raised before the instant petition and alleging that the petitioner abused the writ in violation of 28 U.S.C. § 2254, Rule 9(b). *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). If the government's accusation goes unchallenged, then the belated presentation of a new ground will be deemed the result of deliberate withholding of a claim or other abuse of the writ. Because such conduct flouts Rule 9(b)'s goal of avoiding needless piecemeal litigation, the court will not entertain the new claim. *Sanders, supra.*

This court has said that the abuse of the writ doctrine should be "of rare and extraordinary application." *Paprskar v. Estelle,* 612 F.2d 1003, 1007 (5th Cir.), *cert. denied,* 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980). But subsequent experience recently prompted five members of the Supreme Court to warn:

> A pattern seems to be developing in capital cases of multiple review in which claims that could have been presented years ago are brought forward—often in a piecemeal fashion—only after the execution date is set or becomes imminent. Federal courts should not continue to tolerate—even in capital cases—this type of abuse of the writ of habeas corpus.

*Woodard v. Hutchins,* 464 U.S. 377, ——, 104 S.Ct. 752, 753, 78 L.Ed.2d 541, 544–45 (1984) (Powell, J., concurring in per curiam opinion).

██ Nevertheless, not all piecemeal litigation is "needless," and a petitioner may respond to the allegation of abuse. *E.g., Haley v. Estelle,* 632 F.2d 1273, 1276 (5th Cir.1980). The petitioner may avoid dismissal if he proves by a preponderance of the evidence that he was ignorant of facts necessary to support the new ground when he filed his prior habeas corpus petition. *E.g., Mays v. Balkcom,* 631 F.2d 48, 51 (5th Cir.1980). Thus, a prisoner whose successive petition asserted as a new ground that he had recently become insane did not abuse the writ, because the facts of his recent mental decline were not apparent at the time of the filing of his first petition. *Ford v. Strickland,* 734 F.2d 538 (11th Cir.1984). *Cf. Henry v. Wainwright,* 743 F.2d 761 (11th Cir.1984) (proffering additional evidence of insanity at time of crime).

Alternately, dismissal may be averted by showing that the petitioner did not realize "that those facts would constitute a basis for which federal habeas corpus relief *could* be granted." *Haley v. Estelle,* 632 F.2d at 1275 (emphasis added). The exact scope of this alternative exception to the abuse of the writ doctrine lacks adequate definition. In *Mays,* the panel held as an abuse of the writ a successive petition alleging ineffectiveness of trial counsel. Finding that Mays had known earlier of the facts underlying this claim, the court turned to consider whether he had been "unaware that the facts would constitute a basis for federal habeas relief." 631 F.2d at 51.

This court realizes that a *pro se* petition filed by a prisoner should be examined more liberally than one drawn up by an attorney. A *pro se* applicant will more than likely not be aware of all the possible sets of facts which could result in a granting of relief by habeas corpus. Such does not appear to be the case in this instance, however. Prior to the trial which ultimately resulted in Mays' conviction, Mays informed the court, in the presence of his own attorney, that he did not feel that his attorney could represent him to 'the best of his ability ... in a charge as serious as this when he was only appointed to me yesterday.' Obviously, Mays was well aware of the issue of ineffective assistance of counsel before he ever even considered filing a habeas corpus petition. His failure to include this claim can only be considered inexcusable neglect at best and a deliber-

ate withholding of a ground for relief at worst.

*Id.* That Mays was found to have abused the writ while proceeding *pro se* in his various collateral endeavors underscores the narrowness of the exceptions to the abuse of the writ doctrine.

Significantly, the *Mays* court did not find it necessary to explore whether Mays had, at the time of filing his first petition, considered ineffectiveness in the context of the particular facts that he later asserted entitled him to relief. Rather, the case holds a petitioner accountable for failing to assert a claim in his first petition if he knew then that he could present the legal issue for judicial review that might lead to habeas corpus relief. The question is whether the petitioner knew of the possibility of making such a claim, not whether he believed that the claim itself was meritorious. To excuse every petitioner who later raises a claim that he earlier believed lacked merit would be to carve out an exception for the very group of successive petitions targeted by *Sanders* and Rule 9(b)—those petitions lacking serious merit, brought only for the purpose of delay or vexation. Furthermore, if courts were saddled with the task of deciding whether a prisoner had at one time believed the claim was insubstantial, a factor in ascertaining that belief would be the apparent merit of the claim itself. The very purpose of the abuse of the writ doctrine is to spare the judicial system the burden of exploring the merits of such claims.

In applying these principles here, we begin by reciting the charges of Bernstein's ineffectiveness. The thrust of the attack is that Bernstein should have more thoroughly sought out and presented evidence of Booker's unhappy family background, limited education, military service and psychiatric hospitalizations over the years preceding the murder. Booker specifically faults Bernstein for obtaining fewer than all of the hospital records pertaining to his psychiatric treatment. He also blames Bernstein for not having him examined by a neurologist as well as the three psychiatrists and the psychologist whom Bernstein did arrange for his evaluation. At the least, Booker argues, such additional information might have persuaded the psychologist or one of the psychiatrists that he was insane. He further urges that additional proof might have convinced the jury of his insanity, or at least have suggested a mitigating circumstance rendering the death penalty an inappropriate punishment in his case.

■ From these facts and the relevant law, it is apparent to us that Booker abused the writ by waiting until now to assert ineffective assistance of counsel. Despite his bald allegation that at the time of filing his first petition he was ignorant of the facts necessary to a successful challenge to his attorney's effectiveness, Booker declined to testify and offered no other proof to support a finding of such ignorance. Indeed, there is strong evidence that he was aware of all the relevant information. Booker observed Bernstein's trial performance and spoke at length with the examining psychiatrists about his history and mental condition. During the advisory sentencing proceeding, Booker himself identified the various hospitals in which he had received psychiatric treatment. Transcript of Trial Proceedings, pp. 836–38, 840–43. At the time of filing the first habeas corpus petition, it is very likely that Booker was well aware of his background, his family, his relevant biographical data and his psychiatric history. We have on similar facts held that a petitioner should know his prior mental difficulties and psychological makeup. *Henry v. Wainwright*, 743 F.2d 761, 762 (11th Cir.1984). Booker presents no evidence on the issue, and his unsupported claim of factual ignorance must fail. He had the burden of proof to sustain his allegations.

■ Turning next to his allegation that he was ignorant of his obligation to claim ineffective assistance of counsel in his first petition, we find that he knew both that the claim was legally possible and that he had the means to pursue it. Booker was advised by Bernstein that persons in his position might obtain habeas corpus relief by pressing such a claim. A habeas corpus

petitioner advised by counsel who also represented him at trial must take steps to challenge the lawyer's trial effectiveness in his first petition if he understands that the ground for relief is available. *In re Shriner,* 735 F.2d 1236 (11th Cir.1984). On facts virtually identical to these, the *Shriner* court reasoned:

Shriner presents the affidavit of his counsel, Dan O'Connell, in the first habeas proceeding, which states that O'Connell failed to raise ineffective assistance of counsel arguments because he had been one of Shriner's trial counsel as well, and he believed that there were legal and ethical problems with his arguing his own ineffectiveness. Shriner contends that this constitutes sufficient excuse for his failure to raise the ineffectiveness claims in the first petition and that he is entitled at the very least to an evidentiary hearing on the abuse of writ issue. We find this contention without merit. In the first habeas hearing the district court asked O'Connell directly whether he wished to raise an ineffective assistance claim. He answered that he had scoured the trial record and could find no basis for one. This seems to have been a reasonable answer, given that the ineffectiveness claims that Shriner now raises are without merit. Second, O'Connell's affidavit indicates that he fully informed Shriner of his reasons for not raising the ineffective issue. Shriner nevertheless made no effort to displace O'Connell as his counsel, obtain new counsel, or proceed pro se, and raise the ineffectiveness issue. Such strategic choice constitutes deliberate withholding of a claim, and subsequent assertion of that claim is abuse of the writ.

*Id.* pp. 1240–41.

■ In *Shriner,* the court held that to avoid abuse of the writ the petitioner who belatedly alleges ineffectiveness of his trial lawyer who was also his habeas corpus counsel should prove by a preponderance of the evidence one of two circumstances. First, he may show that his habeas corpus counsel deliberately prepared a petition which failed to challenge his trial performance, while actually believing that he had not provided effective assistance. Here, it is undisputed that Bernstein sincerely believed that he had provided adequate representation. It is impossible, therefore, that Bernstein could have acted out of improper self-interest to prevent Booker from pursuing the issue.

■ Second, a petitioner may demonstrate that his attorney led him to believe that he had no alternative but to continue to be represented by his trial counsel in the post-conviction proceedings, thereby foregoing the right to present the issue. Here, Booker has not shown that Bernstein convinced him it was legally or practically impossible to challenge the attorney's performance. In fact, the evidence shows the contrary. Bernstein explained that he could not personally represent Booker in this effort but that another attorney could press the issue. Bernstein even promised to help Booker find additional legal help. Booker has not proven that he faced a "grisly choice" between foregoing the claim by continuing with Bernstein and abandoning all hope of collateral attack. As the *Shriner* court noted, Booker could have obtained additional counsel or proceeded *pro se.* At the latest, he learned of his right to challenge his attorney's effectiveness and Bernstein's inability to pursue it in mid-January, 1982, more than three months before the date of his scheduled execution. Because Booker has failed to prove either of the exceptional circumstances, he cannot now avoid the application of the abuse of the writ doctrine to his ineffectiveness of counsel claim.

Finally, we note that the ends of justice do not here mitigate in favor of entertaining Booker's belated claim. *See, e.g., Potts v. Zant,* 638 F.2d 727, 751–52 (5th Cir. Unit B 1981), *cert. denied,* 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981).

*Procedural Default.*

■ The district court found that three of Booker's grounds for relief—improper prosecutorial comment, discriminatory application of the death penalty and vagueness of the aggravating factor "especially heinous, atrocious or cruel"—were barred

by procedural default because he failed to assert them on his direct appeal in the state court. Under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) and its progeny, noncompliance with a state procedural rule generally precludes federal habeas corpus review of all claims as to which noncompliance with the procedural rule is an adequate ground under state law to deny review. If a petitioner can demonstrate both cause for his noncompliance and actual prejudice resulting therefrom, however, a federal court can review his claims. *United States v. Frady,* 456 U.S. 152, 167, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816, 830 (1982); *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

To forestall a finding of procedural default, Booker first urges that Florida so haphazardly enforces its rule against collateral consideration of matters not raised on direct appeal that the rule is not an adequate procedural bar under *Sykes. Cf. Francois v. Wainwright,* 741 F.2d 1275, 1286 (11th Cir.1984) (holding that Florida's contemporaneous objection rule is adequate because it is consistently applied). Booker's argument overlooks our contrary opinion in *Hall v. Wainwright,* 733 F.2d 766 (11th Cir.1984). There, in a similar situation, we concluded "Hall argues that the Supreme Court of Florida does not enforce its procedural default rules in capital cases. This claim is without merit. The Supreme Court of Florida enforces its procedural default rules in capital cases." 733 F.2d at 777. *Accord, Palmes v. Wainwright,* 725 F.2d 1511, 1525 (11th Cir.1984) (recognizing the *Sykes* effect of Florida's rule against reviewing collaterally issues that could have been raised on direct appeal). An abundance of Florida opinions relying on the rule confirms our finding in *Hall.*

Furthermore, we note that the cases cited by Booker to support his allegation of arbitrariness prove, on careful reading, to be irrelevant. In some of these cases, for instance, the prisoners asserted in § 3.850 motions various attacks that, as a matter of state law, failed to state a claim for which relief could be granted. *E.g.,*

*Straight v. Wainwright,* 422 So.2d 827, 831 (Fla.1982).

Finding that Florida's procedural rule constitutes an adequate ground for denying Booker state collateral review of these three challenges, we address whether Booker has demonstrated the cause and actual prejudice that would prevent application of *Sykes.* The district court made no findings as to cause, Record Excerpts p. 474, but we agree with its conclusion that Booker has not shown actual prejudice arising from these purported errors. His charge that the phrase "especially, heinous, atrocious or cruel" is unconstitutionally vague has already been decisively repudiated by the United States Supreme Court. *Proffitt v. Florida,* 428 U.S. 242, 255–56, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913, 924–25 (1976). The Court has also rejected the claim that Florida unconstitutionally applies the death penalty more often when the victim is white than when the victim is black. *E.g., Sullivan v. Wainwright,* 464 U.S. 109, ——, 104 S.Ct. 450, 451, 78 L.Ed.2d 210, 212–13 (1983). Therefore, as a matter of law no prejudice resulted, and consideration of these issues is barred by procedural default.

To excuse his procedural default pertaining to improper prosecutorial remarks, Booker "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady,* 456 U.S. at 170, 102 S.Ct. at 1596, 71 L.Ed.2d at 832. The remark which Booker challenges as infecting the sentencing decisions occurred in the prosecutor's opening statement.

Now, I will tell you what I think the evidence will show. The date involved is November 9, 1977. The time of the alleged crime is between the hours of 2:00 p.m. and 4:30 p.m. The place is the home of Mrs. Lorine MeMoss Harmon at 207 N.W. Boulevard, Apartment # 3. This is a multiple-family dwelling house, one of the old ones in Gainesville that has been

divided into apartments. You know what I am speaking of.

Mrs. Harmon was residing in apartment number 3 by herself at that time. She is the victim in this case. She is a white female of 94 years of age.

The defendant in this case is Stephen Todd Booker who sits across from me.

Now that you have the essentials, what the State will show to you is....

Trial Transcript, Vol. II pp. 439–40. Photographs properly before the jury showed, inter alia, that the victim was white. The petitioner, who is black, asserts that this statement inflamed racially biased jurors and the judge to impose the death penalty because the victim and defendant were of different races. This argument derives from the racial discrimination claim rejected by the Court in *Sullivan, supra,* and similarly no actual prejudice could be shown here. Moreover, Booker does not even suggest any evidence supporting his allegations of racial bias.

Finally, even assuming the presence of bias, Booker has not shown there was a substantial likelihood that an unbiased decisionmaker would have imposed a life sentence. *Frady,* 456 U.S. at 174, 102 S.Ct. at 1597–98, 71 L.Ed.2d at 834 ("Surely there is no substantial likelihood the erroneous malice instruction prejudiced Frady's chances with the jury."). This burden was particularly heavy here in view of the evidence at the trial. Against the advice of counsel, Booker took the stand at the close of the penalty phase and asked the jury to withhold mercy. Record Excerpts p. 476. The overwhelming evidence of his guilt included conclusive medical evidence taken from his victim's corpse, his footprints in the blood around her body and his own confession to the crime, delivered in an assumed voice belonging to "a demon" named "Aniel." Booker's victim was a ninety-four-year-old woman who was previously unknown to him. Before killing her he raped and tortured her. Under these circumstances, Booker faced a difficult task in arguing that the prosecutor's description of the victim as "white" destroyed a substantial likelihood that he would receive mercy in spite of his own admission that death

was the only appropriate penalty. He has failed to carry that burden.

*Written Proportionality Review.*

Booker charges that the Florida Supreme Court violated his due process rights by not providing him a written account of its proportionality review of his sentence.

Under *Pulley v. Harris,* 463 U.S. 1248, 104 S.Ct. 35, 79 L.Ed.2d 29 (1984), the Constitution does not require that such a review be conducted, much less that it be detailed and in writing. Accordingly, we hold that Booker has no federal right to such a written review.

The Florida Supreme Court has held that Florida law does not afford such a right. *Messer v. State,* 439 So.2d 875 (Fla.1983). We cannot contradict that court's construction of Florida law.

The denial of Booker's petition for a writ of habeas corpus is

AFFIRMED.